UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MARGARET GREEN,                          )
                                         )
              Plaintiff,                 )
                                         )
v.                                       )          No. 4:16-CV-1716-PLC
                                         )
NANCY A. BERRYHILL,                      )
Deputy Commissioner of Operations,       )
Social Security Administration,          )
                                         )
              Defendant.                 )

MEMORANDUM AND ORDER

Plaintiff Margaret Green seeks review of the decision of Defendant Nancy Berryhill, Deputy Commissioner of Operations, Social Security Administration ("SSA"), denying her application for Disability Insurance Benefits under the Social Security Act.[1] (ECF No. 16) Because the Court finds that substantial evidence supports the decision to deny benefits, the Court affirms the denial of Plaintiff's application.

I.      Background and Procedural History

On August 22, 2013, Plaintiff filed an application for Disability Insurance Benefits, alleging disability beginning October 26, 2012 as a result of congestive heart failure, diabetes, shoulder pain, limited mobility of the right arm, and neuropathy. (Tr. 23, 188) The SSA initially denied Plaintiff's claims on May 21, 2014, and Plaintiff filed a timely request for a hearing before an Administrative Law Judge ("ALJ"), which the SSA granted. (Tr. 23) An ALJ conducted a hearing on March 3, 2016, at which Plaintiff appeared and testified. (Id.) In a decision dated April 25, 2016, the ALJ applied the five-step evaluation set forth in 20 C.F.R. §

---

[1] The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (ECF No. 26)

404.1520(a) and, after considering the evidence found in the record and adduced at Plaintiff's hearing, concluded that Plaintiff "was not under a disability within the meaning of the Social Security Act from October 26, 2012 through the date last insured." (Tr. 23) Plaintiff subsequently filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review. (Tr. 1-4) Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 107 (2000) (citing 20 C.F.R. §§ 404.900(a)(4)-(5), 404.955, 404.981, and 422.210(a)).

## II.    *Evidence Before the ALJ*

### A.    *ALJ Hearing*

At the hearing, Plaintiff testified that she was fifty-nine years old and last worked on October 26, 2012 as a "key carrier" at a store. (Tr. 53) She did not return to work due to weakness, frequent falling, neuropathy, and difficulty sitting and standing. (Tr. 54-55) Plaintiff attributed her symptoms to the chemotherapy and radiation treatment she underwent for breast cancer in 2003, during which time she "had eight chemos and six weeks of radiation . . . [and] 20 nodes [taken] out from under my arm." (Id.) However, after treatment, Plaintiff returned to work for "many years" as an office assistant in a doctor's office, where she "put the patients in and out of the room, ma[de] the appointments, [and] t[ook] the telephone calls," among other duties. (Tr. 57) Plaintiff subsequently worked at Straub's, a grocery store, in the deli and then as an assistant manager. (Tr. 59-62) While there, Plaintiff performed such duties as "making sure that when the orders came in, everything was right . . . [and filled, and] put where it was supposed to be put, mak[ing] sure that the people were taking their breaks on time and their lunches, . . . writing out the lunch schedule and the break times, and posting it . . . , and making sure that . . . we had enough supplies on the floor for that day." (Id.) At the hearing, Plaintiff stated that while at

Straub's she was on her feet "all day," and that she regularly lifted "at least up to 20 [pounds] for sure." (Tr. 61)

Plaintiff stated that the health conditions that prevented her from working from 2012 until 2015, the period of time from her initial application to the date she was last insured, included back pain, chest pain, neuropathy, issues with her shoulder, diabetes, and inability to lift or grasp. (Tr. 63-71) Although Plaintiff also mentioned gout and neck pain, she received treatment for neither at that time. (Tr. 76) Similarly, Plaintiff mentioned fatigue, but stated that "it could be, too, with the medications that I take because a lot of my medications . . . can cause drowsiness." (Tr. 70) Plaintiff also used a walker for approximately six months, but became "afraid of it" because she "kept falling to the right with it," and subsequently stopped using it. (Tr. 82-83)

Plaintiff reported being able to perform activities such as "driving to the store in town" and "driv[ing] to Rolla to pick up prescriptions," but not very often. (Tr. 77-78) Plaintiff also "used to pick up dry cleaning, [but] I don't do that anymore since [my husband's] not traveling," and she occasionally did the laundry, dishes, and prepared meals, although her husband "cooks most of the time now." (Tr. 78) Additionally, in May 2014, Plaintiff took a week-long vacation with her husband to Jefferson City, MO, to attend a conference. (Tr. 78-79)

After Plaintiff's testimony, the ALJ examined George Horn, a vocational expert. (Tr. 84-88) First, Mr. Horn classified the Plaintiff's past work according to the Dictionary of Occupational Titles ("DOT"). (Tr. 85-86). According to Mr. Horn, Plaintiff's position as an office assistant at a doctor's office fell under the DOT's description of a secretary and was considered skilled work in the national economy and performed at sedentary exertional level. (Id.) Plaintiff's positions at Straub's most closely related to the DOT's description of a

management trainee and were considered skilled work performed at a light exertional level. (Tr. 86) Second, the ALJ asked Mr. Horn to consider a hypothetical individual with the Plaintiff's age, education, and work experience, able to work at the sedentary level with the following limitations:

> Q: There would be no climbing ladders, ropes, or scaffolds. This individual could occasionally climb ramps and stairs, balance, stoop, crouch, kneel, and crawl. They could frequently reach overhead with the right upper extremity. They should avoid concentrated exposure to excessive vibration, unprotected heights, and hazardous machinery which does not include a motor vehicle.

(Tr. 86-87) Mr. Horn testified that such individual could perform Plaintiff's past relevant work as a receptionist and secretary. (Id.) When the ALJ's second hypothetical changed the overhead reaching with the right upper extremity from frequent to occasional, Mr. Horn stated that the hypothetical individual would still be capable of performing those jobs. (Id.)

### B. Relevant Medical Records

#### 1. Prior to date last insured (November 2012 through December 2015)

The first doctors Plaintiff saw during this period were Dr. Mohammad Kizlibash for sleep apnea, and then Dr. Michael Naughton for a breast cancer follow-up. In November 2012, Plaintiff consulted Dr. Kizlibash because she was dissatisfied with the quality of her sleep. (Tr. 714) After conducting a sleep study, Dr. Kizlibash recommended Plaintiff use a CPAP machine. (Tr. 715) A few months later, Plaintiff saw Dr. Michael Naughton regarding her prior breast cancer diagnosis. (Tr. 293) Dr. Naughton noted that Plaintiff was "without evidence of recurrence" and was tolerating her extended adjuvant therapy well. (Tr. 293) Dr. Naughton also spoke with Plaintiff about diet and exercise, and "recommended she consider the Weight Watchers program." (Id.)

Plaintiff subsequently consulted a number of health care professionals regarding pain with movement. In March 2013, Plaintiff saw Dr. Rachelle Gorrell, Plaintiff's primary care and treating physician, for hip and groin pain. (Tr. 359) Plaintiff displayed normal muscle strength and range of motion upon physical examination, but experienced pain with movement. (Tr. 362) Similarly, in April and May 2013, Plaintiff saw Nurse Practitioner ("NP") Christine Durbin and Dr. Vijay Sekhon for pain with movement of her hips, especially the right hip. (Tr. 373) Plaintiff displayed a normal gait, station, head, and neck (Tr. 363-67), and x-rays of Plaintiff's right hip were negative (Tr. 270).

In July 2013, Plaintiff completed a patient health questionnaire for Dr. Terri Riutcel, in which Plaintiff disclosed that during the preceding two weeks she experienced trouble falling asleep or sleeping too much, feeling tired or having little energy, and poor appetite or overeating. (Tr. 721) In the same questionnaire, though, Plaintiff reported that, despite her poor sleep quality she did "not at all" "feel[] bad about [her]self," struggle to concentrate, "mov[e] or speak[] so slowly that other people could have noticed," or think that she "would be better off dead." (Id.) A month later, when Plaintiff saw Dr. Riutcel regarding her sleep apnea, Dr. Riutcel recorded that a "[claustrophobic] reaction to the mask has most likely contributed to the delay in initiation of treatment for this sleep-related breathing disorder . . . . [W]e discussed reframing alarming thoughts about the mask and her breathing with realistic reassuring thoughts." (Tr. 688) Additionally, Dr. Riutcel stated that "[w]eight loss is advised, preferably under a physician supervised diet and exercise program. Recommend Weight Watches to learn portion control and Mediterranean diet to learn health choices." (Id.)

In addition to seeing Dr. Riutcel, Plaintiff saw a number of other health care professionals in August 2013. When Plaintiff saw NP Durbin, Plaintiff complained of pain when turning her

neck, and reported taking her husband's Oxycodone. (Tr. 374-75) In response, NP Durbin administered a steroid injection. (Id.) When Plaintiff saw NP Molly Rater, Plaintiff complained of fatigue, chest pain, difficulty breathing at night, edema, and shortness of breath. (Tr. 289-90) However, when Plaintiff saw Dr. Naughton to follow-up on her progress with adjuvant therapy, Plaintiff reported good energy, appetite, and no significant pain. (Tr. 291) Accordingly, Dr. Naughton noted that Plaintiff was "overall doing quite well." (Id.) Similarly, when Plaintiff saw Dr. Kim Carmichael for a cardiology consultation, her physical examination was unremarkable. (Tr. 317-19)

In December 2013, Plaintiff returned to Dr. Riutcel to follow-up on her insomnia and sleep apnea. (Tr. 679-82) Plaintiff reported using her CPAP machine "every night," "sleeping much better," "no longer nap[ping] and . . . doz[ing] off inadvertently," and "not [being] sleepy during the day anymore." (Id.) Dr. Riutcel noted Plaintiff's review of systems ("ROS") and physical examination were unremarkable. (Tr. 681) However, Plaintiff reported that she was "filing for disability because she cannot lift or stand due to neuropathy." (Tr. 679) Dr. Riutcel recommended continued use of the CPAP machine and weight loss under a physician supervised diet and exercise program. (Tr. 682)

Later that month, Plaintiff returned to Dr. Gorrell for treatment of her diabetes, neuropathy, sleep apnea, and general fatigue and pain. (Tr. 379-80) Dr. Gorrell "encouraged patient to continue using CPAP. She may need longer to adjust and hopefully will continue to see improvements." (Tr. 380) Dr. Gorrell also stated "many of her issues could be a result of her breast cancer treatment." (Id.) Upon physical examination, Plaintiff displayed a normal gait, tone, and range of motion in her extremities. (Tr. 385) Dr. Gorrell expressed agreement with and support for Plaintiff filing for disability. (Tr. 379-80)

In January 2014, Plaintiff returned to Dr. Gorrell regarding her diabetes, neuropathy, muscle aches, and pain in her foot, hip, and joints. (Tr. 388-92) Plaintiff, when asked to score her pain on a "0-10 numeric scale," rated her pain a "3," corresponding with "achiness." (Tr. 390) Accordingly, Dr. Gorrell adjusted her medication. (Tr. 388) Next, Plaintiff followed up with Dr. Naughton regarding her progress with adjuvant therapy. (Tr. 524-25) Plaintiff reported "significant chest wall neuropathic pain with decreased range of motion of her right arm with loss of strength and weakness." (Id.) Dr. Naughton "recommended a physical therapy to maximize her arm mobility." (Id.)

Later that month, at the recommendations of Dr. Gorrell and Dr. Naughton, Plaintiff saw Dr. Heidi Prather for back, hip, thigh, neck, and arm pain. (Tr. 393) Plaintiff reported feeling a sensation that "cobwebs" were "itching and crawling" on her hand. (Tr. 393) Plaintiff displayed relatively normal range of motion and strength, except for limited range of motion in her neck, during her physical examination. (Tr. 394) X-ray images taken during the appointment showed that Plaintiff's cervical spine was generally unremarkable, but she had moderate to severe degenerative disc disease ("DDD") in the lumbar spine, mild to moderate DDD in the thoracic spine, discectomy and anterior fusion in the lumbar spine, an unchanged mild compression fracture in the lumbar spine, and moderate to severe right acromioclavicular osteoarthritis. (Tr. 397)

In February 2014, Plaintiff reported improvements in various conditions. First, Plaintiff followed up with Dr. Gorrell about her diabetes, neuropathy, and complaints of depression. (Tr. 408) Plaintiff "noted some improvement with increased Cymbalta . . . . [and] some improvement in the depression," and reported no low self-esteem, guilt, or recurrent thoughts of death. (Tr. 410) Plaintiff complained of joint pain and muscle aches but, when asked to score her pain on a

"0-10 numeric scale," she rated her pain a "2," corresponding with "generalized." (Tr. 410-12) Later that month, Plaintiff saw Dr. Anita Bhandiwad for fatigue. (Tr. 422-23) Plaintiff noted some improvement in the quality of her sleep attributable to her CPAP machine. (Id.) Plaintiff also complained of neuropathy related to her diabetes, but denied chest pain or shortness of breath. (Id.) Dr. Bhandiwad stated that Plaintiff's "symptoms seem to be out of proportion to the findings" of her physical examination and diagnostic data (Tr. 423) Dr. Bhandiwad recommended that Plaintiff "begin[] a regular walking routine," and they discussed "the benefits of exercise." (Id.)

Plaintiff next visited Dr. Carmichael for treatment of her diabetes. (Tr. 472-74) Plaintiff reported no diabetic symptoms. (Id.) At the end of the month, at the request of Dr. Prather, Plaintiff underwent a lumbar spine magnetic resonance imaging ("MRI") radiological examination to evaluate her complaints of back pain. (Tr. 402-07) The images revealed broad-based foraminal protrusions, postsurgical changes, facet arthropathy, mild scoliosis, and a chronic compression fracture. (Id.) An MRI of her cervical spine showed only mild degenerative changes (Tr. 404), and a sonogram of her right shoulder was normal (Tr. 406).

In March 2014, Dr. Prather referred Plaintiff to physical therapy. (Tr. 437) At the initial evaluation, Plaintiff reported back pain, neck pain, and difficulty walking. (Id.) Plaintiff attended eight physical therapy sessions throughout the month. (See Tr. 437-58) Also during this time, Plaintiff saw Dr. Marcie Epstein Garland for depression and anxiety. (Tr. 460-61) Plaintiff reported "no prior psychiatric contact or history of depression or anxiety," and stated that "she thinks the Cymbalta is beginning to help her anxiety, insomnia and neuropathic pain." (Tr. 460) Dr. Epstein's treatment plan included "[Plaintiff's] current dose of Cymbalta as for now as she feels that it may be starting to help her anxiety," and Valium for anxiety. (Tr. 461)

In April 2014, Plaintiff saw NP Judith Bush (Tr. 464-66), Dr. Stephen Sides (Tr. 621-25), and Dr. Monica Bishop (Tr. 508-10). At her visits to Nurse Bush and Dr. Sides, Plaintiff complained of neck, shoulder, and arm pain, as well as numbness and tingling sensations in her hands and feet. (Tr. 464, 621) NP Bush administered a steroid shot to mitigate Plaintiff's pain. (Tr. 466) Dr. Sides ordered an x-ray of Plaintiff's hands, which illustrated that the first finger of each of hand, as well as Plaintiff's sacroiliac joints, was osteoarthritic. (Tr. 631-32) After her visits to Nurse Bush and Dr. Sides, Plaintiff saw Dr. Bishop for anxiety, panic attacks, and insomnia. (Tr. 510) Dr. Bishop noted Plaintiff's symptoms were "stable to worse." (Id.)

In May 2014, Plaintiff saw NP Eve Gilstrap (Tr. 468-71), and then followed up with Dr. Bishop (Tr. 504-07). During her visit with NP Gilstrap, Plaintiff reported feeling "fair" with no diabetic symptoms. (Tr. 468) During her visit with Dr. Bishop, Plaintiff reported that her CPAP machine improved her sleep quality. (Tr. 504) Dr. Bishop adjusted Plaintiff's medications. (Tr. 506)

In June 2014, Plaintiff returned to Dr. Riutcel and reported that she "missed some nights wearing her CPAP mask" and occasionally removed it at night without replacing, but that overall she was doing well with the CPAP therapy. (Tr. 674-77) Plaintiff reported no musculoskeletal symptoms. (Tr. 676) Dr. Riutcel recommended that Plaintiff regularly use the CPAP machine, lose weight, "work with her diabetes dietician for a strategy to facilitate weight loss," and "resume Weight Watchers for portion control since it benefitted her in the past" because "achieving ideal weight could partially or fully ameliorate OSA symptoms in some patients." (Tr. 677)

In July 2014, Plaintiff followed up with Dr. Naughton regarding her breast cancer. (Tr. 522) At that time, Plaintiff was "over 10 years out and doing well without evidence of

recurrence." (Id.) Later that month, Dr. Prather ordered X-rays of Plaintiff's knees, which revealed mild medial and lateral compartment osteoarthritis, and she administered a steroid injection. (Tr. 549-51)

In August 2014, Plaintiff saw Dr. Gorrell regarding depression, hypertension, hyperlipidemia, and diabetes, as well as generalized complaints of dizziness, fatigue, and pain. (Tr. 652-56) Plaintiff wondered if a thyroid problem contributed to her fatigue and pain. (Tr. 825) Plaintiff's thyroid size was normal. (Tr. 828)

In September 2014, Plaintiff returned to Dr. Prather for right lower extremity pain and hand weakness, bilateral forearm and hand tingling, and bilateral foot tingling. (Tr. 545) Dr. Prather administered a nerve conduction study, which produced normal results. (Tr. 547) After that, Plaintiff saw Dr. Carmichael for her diabetes, and reported feeling well with no diabetic symptoms. (Tr. 782)

In November 2014, Plaintiff saw NP Gilstrap for her diabetes. (Tr. 754-56) Plaintiff stated that while she experienced some pain in her back, feet, and legs, she generally felt well and experienced no diabetic symptoms. (Id.)

The following month, Plaintiff saw Dr. Tullman for tingling in her extremities. (Tr. 555) Upon physical examination, Plaintiff's extremities were normal. (Tr. 555) Likewise, an electromyography ("EMG") study produced normal results. (Tr. 556) Plaintiff then returned to Dr. Tullman with complaints of weakness. (Tr. 836) Plaintiff's examination produced generally normal results. (Tr. 836) Dr. Tullman ordered another MRI study of Plaintiff's brain, which was unremarkable. (Tr. 836-43)

In February 2015, Plaintiff visited Dr. Mignon Makos complaining that weakness and numbness on her right side had caused several falls. (Tr. 645-46) Plaintiff demonstrated normal

range of motion in her neck, but limited and painful right shoulder abduction. (Tr. 649) When Plaintiff followed up with Dr. Makos in April 2015 regarding numbness and weakness on her right side (Tr. 888), lab evaluations produced normal results (Tr. 894-95).

In March 2015, Plaintiff underwent a number of MRIs, as well as a negative mammogram. (Tr. 860) A lumbar MRI showed an old L1 compression fracture, postoperative changes, and facet degenerative changes without enhancing lesions or significant abnormality. (Tr. 903) MRIs of the cervical spine and thoracic spine showed mild to minimal DDD. (Tr. 905-06) An MRI of Plaintiff's pelvis and hips was unremarkable. (Tr. 908)

In June 2015, Plaintiff returned to Dr. Riutcel, and reported her sleep quality was worse because she inconsistently used her CPAP machine. (Tr. 670) Plaintiff attributed her inconsistent use to several family emergencies. (Id.) Plaintiff's ROS and physical exam were unremarkable. (Tr. 672) Plaintiff stated that she felt "not at all" feel depressed within the last two weeks. (Tr. 696) Plaintiff also stated that she did "not at all" have trouble sleeping, concentrating, or moving or speaking slowly within the last two weeks. (Id.) However, Plaintiff had "several days" of feeling tired with little energy and having a poor appetite or overeating. (Tr. 696) Next, Plaintiff saw Dr. Carmichael for her diabetes and reported that, although she experienced chronic leg pain and tingling in her hands, she generally felt well with no diabetic symptoms. (Tr. 744-45)

In August and September 2015, Plaintiff saw Dr. Sharon Anderson, a podiatrist, for "burning, tingling, numbness and shooting pain of bilateral feet." (Tr. 872) Dr. Anderson found that "symptoms [were] very minimal on the left and have improved on the right." (Id.) Dr. Anderson "[d]iscussed Metanx, Lyrica, Ultram and Anodyne treatment," and "[r]ecommended that patient continue with her Anodyne treatments at physical therapy." (Tr. 873) While at physical therapy at Sport Rehab, Plaintiff complained of generalized pain, tingling, weakness,

and numbness in her feet. (Tr. 911-31) Plaintiff returned to Dr. Anderson regarding the same, for which Dr. Anderson recommended ice, rest, and elevation, and suggested Plaintiff avoid compression or pressure. (Tr. 870-71) In late September 2015, Plaintiff reported significantly less pain and increased activities to Dr. Anderson and her physical therapist. (Tr. 866, 930)

        2.   After date last insured

In February 2016, Dr. Gorrell completed two physical RFC forms on Plaintiff's behalf (Tr. 879-86), and opined that Plaintiff was incapable of even "low stress jobs" (Tr. 883). According to Dr. Gorrell, Plaintiff could only walk half a block to one block. (Tr. 883-85) Dr. Gorrell also stated that Plaintiff needed to: sit for thirty minutes at a time but for no longer than two hours in an eight-hour workday; stand for twenty minutes at a time but for no longer than two hours in an eight-hour workday; and shift positions at will. (Id.) Dr. Gorrell found that Plaintiff could rarely lift weight less than ten pounds, twist, or climb stairs, and she could never stoop, crouch, or climb ladders. (Id.) Finally, Dr. Gorrell concluded that Plaintiff's fine manipulation and ability to grasp and reach was limited. (Id.) Based on these findings, Dr. Gorrell estimated that Plaintiff would be absent more than four days a month. (Tr. 885)

### III.    *Standards for Determining Disability Under the Act*

Eligibility for disability benefits under the Act requires a claimant to demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering her age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920. The five-step evaluation process requires a claimant to show that he or she (1) is not engaged in substantial gainful activity, (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1, (4) is unable to return to his or her past relevant work, and (5) has impairments that prevent him or her from doing any other work. See 20 C.F.R. § 404.1520(a). If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled. Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005).

### IV.    *The ALJ's Determination*

In a decision dated April 2016, the ALJ applied the five-step evaluation set forth in 20 C.F.R. § 404.1520(a). (Tr. 23) First, the ALJ found that Plaintiff "did not engage in substantial gainful activity during the period from her alleged onset date of October 26, 2012, through her date last insured of December 31, 2015." (Tr. 25) Second, the ALJ found that Plaintiff "had the following severe impairments: diabetes mellitus, nonischemic cardiomyopathy, neuropathy, shoulder degenerative joint disease ("DJD"), DDD of the lumbar spine and status post fusion at L4-5, DDD of the cervical spine, obesity, sleep apnea, DJD of the bilateral knees, DJD of bilateral hips, paresthesia and genu recurvatum of the right lower extremity." (Id.) The ALJ also noted the following nonsevere impairments: hypertension and mild gastritis; "some gout"; and anxiety and affective disorder. (Tr. 25-27) The ALJ also noted that Plaintiff had a history of

breast cancer treatment and a polyp removed from her colon, and that she reported a non-medically determinable history of myocardial infarction and congestive heart failure. (Id.) Third, the ALJ concluded "the claimant did not have an impairment or combination or impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I." (Tr. 27)

After reviewing Plaintiff's testimony and medical records, the ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause some symptoms," but that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not supported by the objective medical evidence . . . ." (Tr. 31) The ALJ found Plaintiff had the RFC to:

> [P]erform sedentary work as defined in 20 C.F.R. 404.1567(a) except she can occasionally climb ramps and stairs but should avoid climbing ladders, ropes, and scaffolds. She can occasionally balance, stoop, crouch, kneel, and crawl. She can occasionally reach overhead with her right upper extremity. She should avoid concentrated exposure to excessive vibration and avoid concentrated use of hazardous machinery, which does not include vehicles, and unprotected heights.

(Tr. 30)

At step four of the sequential analysis, the ALJ determined that Plaintiff was "capable of performing past relevant work as a receptionist and secretary. This work did not require the performance of work-related activities precluded by claimant's [RFC]." (Tr. 33) Consequently, the ALJ concluded that Plaintiff was "not under a disability, as defined in the Social Security Act[.]" (Id.)

## V.     *Standard for Judicial Review*

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g); see also Jones v. Astrue, 619 F.3d 963, 968 (8th Cir. 2010). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate

to support a conclusion." Combs v. Berryhill, 878 F.3d 642, 646 (8th Cir. 2017) (quoting Brown v. Colvin, 825 F.3d 936, 939 (8th Cir. 2016)). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, "as long as substantial evidence in the record supports the Commissioner's decision, [the Court] may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently." Cline v. Colvin, 771 F.3d 1098, 1102 (8th Cir. 2014) (quoting Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002)). A court "do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

"If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff, 421 F.3d at 789). The Eighth Circuit has repeatedly held that a court should "defer heavily to the findings and conclusions" of the SSA. Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

## IV. *Discussion*

Plaintiff claims that substantial evidence does not support the ALJ's RFC determination because the ALJ: (1) failed to consider the consistency of Plaintiff's subjective complaints with the record as a whole; and (2) improperly weighed medical opinion evidence. Plaintiff further asserts that the ALJ erred in finding that she had the RFC to perform her past relevant work.

[ECF No. 16] Defendant counters that substantial evidence in the record supported the ALJ's decision because the ALJ appropriately considered Plaintiff's subjective complaints, medical records, and medical opinion evidence. [ECF No. 23]

A. *Subjective Complaints*

Plaintiff argues the ALJ erred in formulating her RFC because the ALJ: (1) failed to properly consider Plaintiff's subjective allegations of disabling symptoms, including weakness, continuous falling, neuropathy, difficulty sitting and standing, back and shoulder pain, fatigue, neck pain, and hip and leg pain; (2) improperly considered Plaintiff's activities of daily living; and (3) assigned too little weight to the third-party statement by Plaintiff's daughter. [ECF No.16] In response, Defendant asserts the ALJ properly considered the inconsistencies between Plaintiff's subjective allegations, on the one hand, and her activities of daily living and objective medical evidence, on the other. (ECF No. 23)

For purposes of Social Security analysis, a "symptom" is an individual's own description or statement of her physical or mental impairment(s). SSR 16-3p, 2017 WL 5180304, at *2 (Soc. Sec. Admin. Oct. 25, 2017). If a claimant makes statements about the intensity, persistence, and limiting effects of her symptoms, the ALJ must determine whether the statements are consistent with the medical and other evidence of record. Id. at *8.    See also See 20 C.F.R. § 404.1529(c)(3) (explaining how the SSA evaluates symptoms, including pain).

When evaluating a claimant's subjective statements about symptoms, the ALJ must "give full consideration to all of the evidence presented relating to subjective complaints," including a claimant's work history, and observations by third parties and physicians regarding:  "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5)

functional restrictions." <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." <u>Gregg v. Barnhart</u>, 354 F.3d 710, 714 (8th Cir. 2003). <u>See also</u> SSR 16-3p, at 2017 WL 5180304, at *11.

Here, the ALJ reviewed the objective medical evidence of record and determined that it failed to support the alleged severity, persistence, and limiting effects of Plaintiff's symptoms. (Tr. 31) In his analysis, the ALJ specifically referred to several objective measures during the relevant period to explain why Plaintiff's physical conditions were not "totally disabling." (Tr. 31) For example, in regard to Plaintiff's diabetic symptoms, the ALJ noted that "[o]ne of her doctors observed that she generally feels well and she has no diabetic symptoms[.]" (Tr. 31) The ALJ acknowledged Plaintiff's diagnosis and treatment for diabetic neuropathy, but also observed that an EMG performed in September 2014 "showed no evidence of large fiber neuropathy or radiculopathy in her right arm or leg." (<u>Id.</u>) To the extent that Plaintiff "probably experiences a mild form of peripheral neuropathy," the ALJ found that "it does reduce her ability to engage in work activities." (<u>Id.</u>)

The ALJ also credited Plaintiff's complaints of pain in her right arm. (Tr. 31) The ALJ explained that x-rays from January 2014 "showed moderate to severe right acromioclavicular arthritis" and a physical examination the same month "showed decreased range of motion and decreased muscle strength for her right arm." (<u>Id.</u>) The ALJ accommodated the impairment in Plaintiff's RFC by "limiting her overhead work." (<u>Id.</u>)

Finally, the ALJ addressed the severity, persistence, and limiting effects of her musculoskeletal symptoms. (Tr. 31) The ALJ recognized that x-rays and MRI studies of Plaintiff's spine showed "some degenerative joint disease" in her cervical and lumbar spine and

"some degenerative disc disease" of the lumbar, thoracic, and cervical spine. (Id.) Plaintiff also received a diagnosis of genu recurvatum on the right. (Id.) The ALJ noted, however, that there was no evidence of root impingement and "after participating in physical therapy, her conditions improved significantly." (Tr. 31) "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010)). Nevertheless, the ALJ limited Plaintiff to sedentary work with numerous exertional limitations. (Tr. 30)

As further evidence that these symptoms were not totally disabling, the ALJ pointed to Plaintiff's testimony "that she is capable of driving her car to go shopping or pick up prescriptions." (Tr. 31) At the hearing, Plaintiff testified that she was able to drive and occasionally do the laundry, wash dishes, and prepare meals. (Tr. 78) In her function report, Plaintiff stated that, on a typical day, she "clean[ed] up a little in the house" and "sometimes [did] the dishes." (Tr. 223) Plaintiff let her dogs in and out of the house, retrieved the mail, and regularly went to the grocery store, bank, and gas station. (Tr. 227)

Plaintiff correctly argues that a claimant's ability to perform "sporadic light activities" does not signify that she is able to perform full-time competitive work. See, e.g., Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005). Nonetheless, an ALJ may consider a claimant's activities of daily living inconsistent with his allegations of disabling impairment and consider such activities when judging the credibility of subjective complaints. See McDade v. Astrue, 720 F.3d 994, 998 (8th Cir. 2013). The ALJ did not err in finding that Plaintiff's ability to perform activity undermined her allegations of total disability. See, e.g., Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003).

Plaintiff also contends that the ALJ erred in assigning little weight to the third-party report Plaintiff's daughter completed in December 2013. In the report, Plaintiff's daughter described Plaintiff's slow movement and extreme fatigue. (Tr. 197-202) The ALJ reviewed the third-party report, and stated: "her observations are generally not consistent with claimant's ability to do household chores, drive to the store to shop, and go on vacation." (Tr. 33) The ALJ therefore placed "more weight on the objective medical evidence" and concluded that the "report cannot be given significant weight." (Id.) ALJ properly considered the testimony of Plaintiff's daughter and found it unpersuasive.

For the above reasons, the Court finds the ALJ properly considered the factors set forth in Polaski and SSR 16-3p. Substantial evidence supported the ALJ's determination that Plaintiff's subjective allegations of disabling symptoms were inconsistent with the objective medical evidence and Plaintiff's activities of daily living.

B. *Medical opinion evidence*

Plaintiff claims the ALJ failed to properly weigh the medical opinion evidence. [ECF No. 16] More specifically, Plaintiff maintains that the ALJ assigned too little weight to the opinion of Plaintiff's treating physician, Dr. Gorell, and too much weight to the opinion of two non-examining consulting physicians. Defendant counters that the ALJ properly considered the medical opinion evidence. [ECF No. 23]

A treating physician's opinion regarding a claimant's impairments is entitled to controlling weight where "the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). Even if the opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight.

Id. This rule is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians. See 20 C.F.R. §§ 404.1527, 416.927; Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as [a] whole." Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (quotation omitted).

If an ALJ declines to give controlling weight to a treating physician's opinion, the ALJ must consider the following factors in determining the appropriate weight: length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization. 20 C.F.R. §§ 404.1527(c), 416.927(c). Whether the ALJ grants a treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)).

Dr. Gorrell treated Plaintiff for chest pain and difficulty breathing in August 2012. Dr. Gorrell increased Plaintiff's metoprolol, prescribed Nitrostat SL PRN, and referred Plaintiff to a cardiologist. When Plaintiff followed up with Dr. Gorrell the next month, she reported continued weakness, chest pain, and shortness of breath with activity. Dr. Gorrell increased Plaintiff's metoprolol, scheduled a pulmonary function test, referred her back to oncology "to get opinion on side effects of cancer treatments," and "tentatively" ordered Plaintiff off work until September 17, 2012. (Tr. 355)

Plaintiff returned to Dr. Gorrell's office in March 2013 for hip and groin pain. (Tr. 359-62) Plaintiff described the pain as "worse at night but present throughout the day" and rated it a

four on a ten-point scale. A physical exam revealed full range of motion "but painful" and "good muscle strength." (Tr. 362) Dr. Gorrell prescribed prednisone and Vicodin.

Plaintiff next visited Dr. Gorrell in December 2013 for depression, joint pain, pain in her right hip and leg, and numbness in her right hand. (Tr. 382) Plaintiff rated the pain in her right hip and leg as a three, which corresponded with "achiness." (Tr. 390) Dr. Gorrell expressed agreement with Plaintiff's decision to apply for disability benefits and stated that could not "sit for more than 30 minutes or stand more than 10-15 minutes," wash dishes or cook, or "clean like she used to." (Tr. 382) When Plaintiff returned two weeks later, she reported no improvement with Cymbalta and continued to rate her pain at a three. Dr. Gorrell prescribed Tramadol.

At Plaintiff's February 2014 appointment with Dr. Gorrell, Plaintiff reported she "continues to feel 'blah' and pain remains present." (Tr. 409) Plaintiff rated her pain level at two and "noted some improvement" with Tramadol and increased Cymbalta. (Tr. 410-11) In August 2014, Plaintiff reported fatigue, "hurt[ing] all over," and dizziness with "position change." (Tr. 656) Plaintiff informed Dr. Gorrell that she underwent injections "for her neck and lower back," which "helped initially but pain returned." (Tr. 656) Plaintiff also complained that she was "dropping things from her right hand," and Dr. Gorrell ordered a nerve conduction study. (Tr. 652)

Six months later, Dr. Gorrell completed two RFC questionnaires for Plaintiff. In the MSS, Dr. Gorrell opined that Plaintiff's pain would frequently interfere with her attention and concentration, she was incapable of even "low stress jobs," and she would miss more than four days of work per month. Dr. Gorrell stated that Plaintiff could sit thirty minutes at a time for about two hours in an eight-hour work day and stand thirty minutes at a time for less than two

hours in an eight-hour workday. According to Dr. Gorrell, Plaintiff could rarely twist or climb stairs and had significant limitations with reaching, handling, and fingering.

The ALJ reviewed Dr. Gorrell's treatment notes and RFC questionnaires and assigned Dr. Gorrell's opinion "minimum weight." (Tr. 33) The ALJ explained: "Dr. Gorrell's assessment is not consistent with the objective medical evidence, which shows that she generally has good range of muscle and muscle strength, and not consistent with the claimant's activities, which include doing household chores, driving her car, and going on vacation." (Tr. 33) In addition, the ALJ stated: "Dr. Gorrell did not explain why she feels the claimant cannot work by linking her physical impairments to specific physical limitations, and it is impossible to discern exactly how Dr. Gorrell arrives at the conclusion that the claimant cannot do even sedentary work." (Id.) Because the ALJ found that Dr. Gorrell's opinion was "not well reasoned" and was inconsistent with her own treatment notes, the ALJ assigned her opinion "minimum weight." (Id.)

"A treating physician's opinion is not automatically controlling and may be discredited when other medical opinions are supported by better medical evidence or when the physician gives inconsistent opinions." Turpin v. Colvin, 750 F.3d 989, 994 (8th Cir. 2014) (internal citations omitted). In this case, the ALJ thoroughly reviewed and discussed Plaintiff's medical records and objective medical evidence (including Plaintiff's various EMG, x-ray, MRI, and echocardiogram reports), and determined that they did not support the conclusion that Plaintiff was incapable of even limited, sedentary work. The ALJ considered all of the evidence of record to conclude that, while Plaintiff suffered impairments, her resulting limitations were not as severe as stated by Dr. Gorrell.

Plaintiff also claims that the ALJ erred in assigning too much weight to the opinions of non-examining, state agency consultants, Drs. Stoecker and Bankhead. In particular, Plaintiff

complains that because their reports were completed in May and June 2014, respectively, the doctors did not have "all the medical evidence of record before them with which to asses this claim." [ECF No. 16 at 7] In response, Defendant asserts that the ALJ properly considered the opinions of the non-examining doctors and assigned them "significant weight" because they were consistent with the objective medical evidence. [ECF No. 23 at 18-19]

Generally, the opinions of non-examining medical sources are given less weight than those of examining sources. Papesh v. Colvin, 786 F.3d 1126, 1133 (8th Cir. 2013). However, because state agency medical consultants are highly qualified physicians who are also experts in Social Security disability evaluations, the ALJ must consider their findings and opinions as evidence. See 20 C.F.R. § 416.913a. Accordingly, an ALJ's assessment of state agency medical expert opinion is guided by the proposition that "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion." Callaghan v. Colvin, 2013 WL 4678970, at *2 (W.D. Mo. Aug. 30, 2013) (quoting 20 C.F.R. § 416.927(c)).

Upon reviewing Plaintiff's medical records in May 2014, Dr. Stoecker found that while "[Plaintiff] alleges disability due to congestive heart failure . . . . [t]his is an unsupported allegation." (Tr. 101) Dr. Stoecker also agreed with Plaintiff's cardiologist that "her fatigue is out of proportion to sleep apnea." (Tr. 101-02) Next, Dr. Stoecker found that although "[Plaintiff] alleges diabetes as disabling," she has "no severe derangements in metabolic function requiring emergency intervention or hospitalization . . . . no organ damage related to diabetes . . . . [and] normal monofilament." (Tr. 101) Accordingly, Dr. Stoecker concluded this was "a non limiting condition," and was "not supported by the medical record." (Id.)

Upon consideration of this and other evidence in the record, Dr. Stoecker determined Plaintiff's RFC. Dr. Stoecker found that Plaintiff could frequently lift ten pounds and

occasionally lift twenty pounds. (Tr. 32, 91-104, 486-87) Dr. Stoecker also opined that Plaintiff

could stand or walk for two hours of an eight-hour day, sit for six hours of an eight-hour day, and

avoid concentrated exposure to vibration. (Id.) Dr. Stoecker then reasoned that Plaintiff could

push and pull consistent with her lifting limits, including limitations with overhead reaching with

the right hand, and occasionally climb, stoop, and crouch. (Id.)

In June 2014, Dr. Bankhead reviewed Plaintiff's medical records and issued a report

regarding how Plaintiff's physical impairments limit her ability to work. (Tr. 486-87) He agreed

with Dr. Stoecker's assessment. (Id.)

In assessing Dr. Stoecker's finding that Plaintiff did not have nerve root impingement,

the ALJ pointed to treatment notes from Dr. Makos, who provided the Plaintiff with "lifestyle,

weight reduction, dietary, and physical activity" recommendations, and concluded that Plaintiff

did not have nerve root impingement. (Tr. 888-909) The ALJ also pointed to evidence from Dr.

Stoecker highlighting the inconsistencies between Plaintiff's subjective allegations of disability

and the objective medical evidence, which the ALJ credited as reasonably examined and

thoroughly explained. (Tr. 32-33, 101-02) "[A]n appropriate finding of inconsistency with other

evidence alone is sufficient to discount the opinion." Goff, 421 F.3d at 790-91. See also Pearsall

v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001).

The ALJ accorded to Dr. Stoecker's and Dr. Bankhead's findings significant weight:

> [Dr. Stoecker] found the claimant capable of full-time work at the sedentary
> level of exertion. She also included some additional postural limitations. Her
> assessment of the claimant is reasonable because it is supported by the
> objective medical evidence, which shows that she does not have nerve root
> impingement, and it is consistent with her activities of daily living, which
> include household chores and driving . . . .

(Tr. 32) The ALJ similarly found that Dr. Bankhead had reviewed Plaintiff's medical records and

agreed with Dr. Stoecker's assessment. The ALJ reasoned: "Because Dr. Stoeker's assessment is

supported by the evidence of record, Dr. Bankhead's assessment also deserves significant weight. (Id.)

Upon review of the record and the ALJ's decision, the Court finds that the ALJ evaluated all of the evidence of record and provided reasonable explanation for the weight he accorded Dr. Gorrell's, Dr. Stoecker's, and Dr. Bankhead's opinions. Because substantial substantial evidence in the record as a whole supported the ALJ's decision to assign significant weight to the non-examining, consulting physicians and "minimum weight" to Dr. Gorrell, the Court will not disturb that determination. "If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently." Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010).

## C. Past relevant work

Finally, Plaintiff challenges the ALJ's finding that Plaintiff could perform her past relevant work as a secretary and receptionist because the ALJ's opinion "offered a terse one-line explanation." (ECF No. 16 at 13-14) In response, Defendant argues that substantial evidence supports the ALJ's determination. (ECF No. 23)

The Eighth Circuit has held that the ALJ must "fully investigate and make explicit findings as to the physical and mental demands of a claimant's past relevant work and to compare that with what the claimant herself is capable of doing before he determines that she is able to perform past relevant work." Nishke v. Astrue, 878 F.Supp.2d 958, 988 (E.D. Mo. 2012) (quoting Minick v. Sec. of Health & Human Serv., 887 F.2d 864, 866 (8th Cir. 1989)). An ALJ may discharge this duty by referring to specific job descriptions in the Dictionary of

Occupational Titles and by relying on the testimony of a vocational expert. <u>Wagner v. Astrue</u>, 499 F.3d 842, 853 (8th Cir. 2007); <u>Pfitzner v. Apfel</u>, 169 F.3d 566, 569 (8th Cir. 1999).

At the hearing, Plaintiff testified that she previously worked as an office assistant in a doctor's office, where she "put the patients in and out of the room, ma[de] the appointments, [and] t[ook] the telephone calls." (Tr. 57)  The ALJ later elicited testimony from a vocational expert regarding Plaintiff's past work as a secretary and receptionist. The ALJ also presented a hypothetical question to the vocational expert that fully described Plaintiff's RFC, which was supported by substantial evidence on the record as a whole.  In response, the vocational expert testified that such an individual would remain able to perform Plaintiff's past jobs as a secretary or receptionist. The vocational expert's testimony constitutes substantial evidence that Plaintiff can perform past relevant work. <u>See</u> <u>Lane v. Colvin</u>, 650 Fed. Appx. 908, 911 (8th Cir. 2016); <u>Cruze v. Chater</u>, 85 F.3d 1320, 1323 (8th Cir. 1996); <u>Hurd v. Colvin</u>, No. 4:12-CV-228-JCH, 2013 WL 1149160, at *1 (E.D. Mo. 2013).

### *IV. Conclusion*

For the reasons discussed above, the undersigned finds that substantial evidence in the record as a whole supports the Commissioner's decision that Plaintiff is not disabled. Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying Social Security Benefits to Plaintiff is **AFFIRMED**.

A separate judgment in accordance with this Memorandum and Order is entered this date.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 6th day of February, 2019